IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
      v.                         )      Criminal Action No.
                                 )      10-00328-01-CR-W-DW
MICHAEL G. LARSON,               )
                                 )
            Defendant.           )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS STATEMENT**

Before the court is defendant's motion to suppress his statement on the grounds that (1) his statement was obtained after an unlawful search of his residence and constitutes the unlawful fruit of that search, and (2) his statement was involuntary. Defendant's fruits argument has been addressed in a separate motion to suppress evidence in which I have found that the search was not unlawful. Here I find that defendant's statement was voluntary. Therefore, defendant's motion to suppress his statement should be denied.

*I.   BACKGROUND*

On November 10, 2009, a search warrant was executed at defendant's residence. During the search, defendant was interviewed and made incriminating statements regarding receipt, distribution, and possession of child pornography. On November 19, 2010, an indictment was returned charging defendant with one count of attempted receipt of child pornography over the

internet, in violation of 18 U.S.C. § 2252(a)(2), two counts of attempted distribution of child pornography over the internet, in violation of 18 U.S.C. § 2252(a)(2), one count of receiving child pornography over the internet, in violation of 18 U.S.C. § 2252(a)(2), and one count of possessing child pornography, in violation of 18 U.S.C. § 2252(a)(4).

On February 25, 2011, defendant filed a motion to suppress (document number 19) arguing that his statement was the fruit of an illegal search and that he "also believes that his statements were involuntary under the totality of the circumstances inasmuch as his 'will' was overborne by the inherently coercive setting in which he found himself." Defendant does not elaborate on that argument.

On March 11, 2011, the government filed a response (document number 20) arguing that defendant was at his own home, was advised he was not under arrest, was advised of the nature of the investigation, and was not placed under arrest at any time that day. Additionally, agents made no threats, displayed no violence, and made no promises in order to get defendant to make a statement.

On April 6, 2011, I held a hearing on defendant's motion. The government appeared by Assistant United States Attorney Teresa Moore. The defendant was present, represented by John Osgood. The following witnesses testified:

1.   FBI Special Agent Michael Daniels

2.   Angela Pennington, defendant's girl friend

3.   Defendant, Michael Larson

In addition, the government offered the FBI 302 of the interview with defendant which was admitted as plaintiff's exhibit 1.

## II.  *EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.   On November 10, 2009, law enforcement authorities executed a search warrant on 1401 South Osage Street, Independence, Missouri (Tr. at 7-8).  The residence was an older two-story home with a large front porch with a bench off to the right of the front door (Tr. at 36).  Agents arrived at defendant's residence at 6:45 a.m., which is standard procedure so that it is likely someone is home and for officer safety since residents are usually caught off guard at that time of morning (Tr. at 8-9, 29).  Six to eight agents were present, which is standard (Tr. at 9).  It is typical to keep one or two agents with each resident, and the agents want to be able to search the entire place in a reasonable amount of time (Tr. at 9-10).

2.   For safety, the law enforcement officers who were present wore bullet proof vests with "FBI" or "Police" clearly displayed (Tr. at 10, 34).  They had their guns drawn, in a "low

ready" position, i.e., pointed at the ground (Tr. at 11, 34). No gun was pointed at anyone during this incident (Tr. at 11).

3. The agents could see lights on inside the residence, so they assumed someone inside was up (Tr. at 36). Agent Daniels knocked on the door and announced their presence, stating that they were there with a search warrant (Tr. at 9, 10). Either Angela Pennington or defendant came to the door;[1] agents stated they had a search warrant and they were let inside the house (Tr. at 9).

4. The standard procedure is to remove everyone from the residence so that there is no access to any possible weapons and so that the residence can be swept and secured without concern for officer safety (Tr. at 11). Defendant and Ms. Pennington were taken to the front porch during the security sweep (Tr. at 12). They sat together on the bench (Tr. at 37). Special Agent Daniels and a uniformed police officer stayed on the porch with them (Tr. at 12). Police conducted the security sweep in five minutes or less (Tr. at 12). The only people present in the house were defendant and Angela Pennington (Tr. at 11-12). Once the residence was secure, the agents and officers put their vests in their cars and holstered their weapons (Tr. at 23, 39).

---

[1]Special Agent Daniels testified that he does not remember whether it was defendant or Ms. Pennington who answered the door (Tr. at 30).

4

5.     Special Agent Daniels told defendant and Ms. Pennington
that he had a search warrant, he gave them a copy of the warrant,
and he summarized the investigation (Tr. at 12-13, 38).  They
were told that there were no charges pending, no one was under
arrest, they were free to leave, and any statements they made
would be voluntary (Tr. at 14, 38, 44).  The officers knew that
defendant worked, so they told him that if he wanted to go to
work, he could go to work (Tr. at 14).

6.     Once the house was secured, the agents found an area
within the house, somewhat removed from where the search was
occurring, where they could conduct interviews (Tr. at 13-14).
Defendant and Ms. Pennington were separated for the interviews
(Tr. at 14).

7.     Defendant was interviewed first; the interview took
place in the dining room (Tr. at 15).  Special Agents Michael
Daniels and Richard Anderson conducted the interview (Tr. at 16).
Special Agent Anderson had been on the job for about three months
at the time (Tr. at 16).  His role was to act as the second agent
present, which is standard procedure during an interview, but
also to observe (Tr. at 16).

8.     Defendant was told again that there were no charges
pending, that no one was under arrest, that any statement was
voluntary, that no one would be arrested and taken with them when
law enforcement authorities left (Tr. at 15).  Defendant was told

that he was going to stay there and continue about his day as he normally would (Tr. at 15).

9.   The dining room was just inside the house, the first room on the left (Tr. at 15).  Nothing was blocking any of the doors (Tr. at 15).  Officers executing the search warrant would bring items out the front door which was near the dining room, but no one came into the dining room during the interview (Tr. at 23).  The agents started out making small talk about remodeling of the house that was going on (Tr. at 16).  They explained again the search warrant and the probable cause which brought them there (Tr. at 16).

10.  Defendant agreed to speak to the agents and did not show any hesitation about making a statement (Tr. at 17).  When defendant agreed to talk to the agents, he was taken into the dining room without Ms. Pennington (Tr. at 39).  Defendant was reminded that he was not under arrest and that he was free to leave (Tr. at 40-41).  Special Agent Daniels learned that defendant was 34 years of age (Tr. at 17).  Defendant said he drove a green Ford F150 and had lived at 1401 South Osage for over five years (Tr. at 19).  Defendant said he worked at Lafarge as an equipment operator, a position he had held for six years (Tr. at 19).  Special Agent Daniels asked defendant if he had access to computers at work; defendant said he did, but it was a basic computer without internet access (Tr. at 19).

6

11.  Defendant said there were three computers in his home; one belonged to Ms. Pennington, one was his, and one was used by his stepson (Tr. at 20).  The one used by his stepson was not connected to the internet (Tr. at 20).  The computers were all in an upstairs room (Tr. at 20, 41).

12.  Defendant said he used his computer to buy and sell things on eBay, to do general internet surfing, and he also used LimeWire (Tr. at 20).  LimeWire is a peer-to-peer file sharing program (Tr. at 20).  Defendant said he used LimeWire to download music and pornography (Tr. at 20).

13.  Special Agent Daniels asked defendant about child pornography (Tr. at 20).  Defendant said that a couple years ago he saw an image of child pornography using LimeWire (Tr. at 21).  After he saw the first image, it peaked his curiosity and he began to look for additional images of child pornography (Tr. at 21).  Defendant last looked at child pornography a few days prior to the search of his house (Tr. at 21).

14.  Defendant said there were no issues with the functioning of his computer (Tr. at 21).  He used the terms "pre-teen," "teen," "Loli" and "hussy fan" to search for child pornography (Tr. at 22, 41).  Defendant was aware of the file sharing feature of LimeWire (Tr. at 22).  Defendant said he did not think he had shared any child pornography through LimeWire, but there was a possibility that he had (Tr. at 22).

15.   Defendant and Ms. Pennington lived at 1401 South Osage (Tr. at 22).   Defendant said his stepson would visit every other weekend and a Chadwick St. Clair lived there off and on (Tr. at 22).   Mr. St. Clair had lived there for about a year and had moved out recently (Tr. at 22-23).

16.   Defendant was not advised of his Miranda rights because he was not in custody and was free to leave (Tr. at 17).   Special Agent Daniels had no difficulty communicating with defendant; he appeared to understand the questions, and his responses were relevant to the questions asked (Tr. at 18).   The interview was conversational -- not question/answer -- and there was no hostility, no raised voices  (Tr. at 18, 41).   Defendant's demeanor was cooperative (Tr. at 18).   He knew why they were there, so the agents only had to ask simple questions (Tr. at 24).   Defendant showed the typical nervousness that the agents see when they talk to people (Tr. at 18).

17.   No one lied to defendant, no one attempted to threaten or frighten defendant, there were no promises made by anyone, no tricks were used to get him to speak with the agents (Tr. at 24-25, 29).   Defendant was never told he was required to talk to the agents; he never indicated that he wanted to stop talking to them or call an attorney (Tr. at 25).   Nothing was damaged during the execution of the search warrant (Tr. at 13).   At no time were defendant or Ms. Pennington handcuffed (Tr. at 15).   Once the

residence was secured, the agents and officers holstered their weapons and no weapon was displayed after that time (Tr. at 24). Law enforcement officers were in the residence a total of about an hour[2] (Tr. at 24, 26). The interview of defendant took about 30 minutes (Tr. at 24, 26, 44).

Angela Pennington

18. At the time of the hearing, Ms. Pennington had been in a relationship with defendant for about ten years (Tr. at 46, 57). She was living with defendant on the day of the search (Tr. at 46, 57). At 6:00 a.m. she and defendant were in bed when she heard pounding on the door and someone shouting, "FBI" (Tr. at 47). The bedroom is on the first floor of the two-story house (Tr. at 49-50). She and defendant got up intending to answer the door but expecting it to be her neighbor who was known to play pranks on people around the neighborhood (Tr. at 64-65). As she and defendant were walking out of their bedroom, she saw the door swing open, someone put a flashlight in her face, and people were "going around with guns." (Tr. at 47). The guns were pointed directly at her and defendant (Tr. at 49). Ms. Pennington believed that the flashlights were part of the weapons (Tr. at 56). The officers had assault weapons and rifles (Tr. at 49). Ms. Pennington did not open the front door -- she was just coming

---

[2]The receipt of property taken, which is signed by the resident when the police are ready to leave, was signed by defendant at 7:55 a.m. (Tr. at 25-26).

9

out of her bedroom when she was told to put her hands out (Tr. at
47-48). Ms. Pennington and defendant both put their hands out in
front of them (Tr. at 51-52). An agent told Ms. Pennington that
the front door of the house was not locked (Tr. at 48).
Defendant and Ms. Pennington never lock their front door (Tr. at
48). Both defendant and Ms. Pennington were dressed in sweat
pants and t-shirts, which is what they typically wear to bed (Tr.
at 48).

    19. Defendant and Ms. Pennington were taken out to the
front porch (Tr. at 52). No one told them they could get shoes
and socks or that they could leave (Tr. at 53). Had anyone told
Ms. Pennington she could leave, she would have (Tr. at 53). Ms.
Pennington was told only that the agents had a search warrant
(Tr. at 54). Defendant tried to get up and walk around the
porch, but he was told to sit back down (Tr. at 55). Some
officers took defendant inside and left Ms. Pennington on the
porch with two other officers (Tr. at 56). No one told her that
she did not have to talk to the officers; they said, "We just
have a few questions for you." (Tr. at 56). Ms. Pennington
thought she was in custody (Tr. at 56, 58, 63). The officers did
not tell her she was under arrest, but they also did not tell her
she was free to leave (Tr. at 58, 63). She asked if she could
get her cell phone so she could call her boss "to let my boss
know I was going to be late." (Tr. at 57). An officer said, "Oh,

we'll be out of here pretty quick." (Tr. at 57). Ms. Pennington stayed out on the porch for 30 to 45 minutes (Tr. at 53). She talked to the officers once they were done talking to defendant (Tr. at 57). She told them that she and defendant's brother had seen an image of a very young child on defendant's computer (Tr. at 60).

20. Neither Ms. Pennington nor defendant were arrested at any time that day (Tr. at 58-59). No one was handcuffed that day (Tr. at 59, 62). The agents left around 7:30 or 7:45 (Tr. at 59).

21. To the extent it contradicts the testimony of Special Agent Daniels, I do not find Ms. Pennington's testimony credible for the following reasons:

    a. Ms. Pennington testified that she thought she was in custody; but she also testified that she asked if she could get her phone so she could call her boss to say she was going to be late. Had she believed she was in custody, she would have thought she would miss work, not be late.

    b. As far as the issue of whether the officers entered the residence on their own or after one of the residents opened the door, Ms. Pennington's testimony was all over the place:

        i. She first testified that as she was exiting her bedroom, she saw "people" armed with assault

weapons already in her house and shining flashlights at her (Tr. at 47–48).

    ii.  Upon examination by me, she testified that "they were outside of the house in front of the dining room window." (Tr. at 65).

    iii. Because of her conflicting testimony, I tried to get clarification as to whether the agents were inside the house or outside the house when she came out of her bedroom.  Ms. Pennington then said, "They were coming in the house." (Tr. at 65).

Whether the agents were inside the house or outside the house is a very simple question; however, Ms. Pennington had difficulty sticking with a solid answer:

Q.    When you say coming in the house, where were they?

A.    They were at the front door.

Q.    Were they inside the residence or at the front door of the residence? . . .  [I]t's pretty simple.  I'm trying to get an idea, if somebody is at your front door knocking, they're outside the house.

A.    Yes.

Q.    When they step through the front door and they're in your living room . . ., they're inside your house.  Are you saying that these agents were inside your house when you were trying to come out [of your bedroom]?

A.    They were coming in the house at that time, yes.

Q.    They were already coming in.  Where were they?

A.   They were -- one of them was standing right inside
     the door with the light flashing telling us to put
     our hands out. . . .  I'm right here and the door
     pops open.  And I heard one voice.  I don't know
     if there -- how many people were behind that
     person.  But I also saw a person outside the
     dining room window at that time, too, as well.
     (Tr. at 65-67).

iv.  When asked again whether there were multiple

officers in the house when she came out of her bedroom,

Ms. Pennington said, "I know of one person because I

only heard one voice inside the house." (Tr. at 67).

v.   I asked one final time, "All I care about,

ma'am, all I want to know is were -- are you saying

that these agents were inside your house before you

ever came to the door and let them in or Michael came

to the door and let them in?" to which Ms. Pennington

said, "Yes.  They were inside the house before we even

got to the living room door." (Tr. at 67-68).

Because Ms. Pennington testified that at the time she

exited her bedroom, there were "people" already walking

around her house with guns, there were people outside on the

porch whom she could see through a window, there were people

coming into the house, there was one person coming in the

house and others outside, and that she heard the voice of

one person inside the house, and then back to multiple

people being in the house already, I give no weight to her

testimony on this issue.

c.    Ms. Pennington testified that the officers arrived at 6:00 a.m.  Special Agent Daniels testified that they arrived at 6:45 a.m.  There is no dispute that the receipt of property form signed by defendant states that the law enforcement officers left at 7:55 a.m.  Ms. Pennington's testimony, therefore, is that law enforcement were present for just under two hours.  Special Agent Daniels's testimony is that they were there for about 50 minutes.  A comparison of the various stories of how long things occurred leads me to conclude that Ms. Pennington's testimony on this issue is not credible.

Special Agent Daniels testified that it took about five minutes to conduct a security sweep of the residence.  He then questioned defendant for approximately 30 minutes.  The questioning of defendant included small talk about the remodeling he was doing to the house.  This leaves approximately 15 minutes for the agents to interview Ms. Pennington before departing at 7:55.

Defendant testified that the agents arrived at 6:00 a.m. (although he did not have a watch and did not look at a clock).  He said he spent 15 minutes on the porch and then he was questioned for 20 to 25 minutes.  This takes up a maximum of 40 minutes meaning that the police would then have spent the remaining hour and 15 minutes questioning Ms.

Pennington.

Finally, Ms. Pennington testified that she spent 30 to 45 minutes on the porch. This would encompass the time when the security sweep was being conducted and when defendant was being interviewed. She was then interviewed. Again, this would leave a minimum of one hour and ten minutes for her interview.

It is not plausible that defendant, who admitted to police that he was looking at and downloading child pornography, would be interviewed approximately one third the length of time Ms. Pennington was. The more believable scenario is that the police arrived at 6:45, conducted a security sweep of the residence for about five minutes and questioned defendant for 30 minutes -- which matches Ms. Pennington's recollection of how long she was on the porch before being questioned -- and then they spent about 15 more minutes questioning her before they left.

d.   Ms. Pennington testified that someone was shining a flashlight at her, yet she saw "people" running around her home with guns. Aside from the noncredible testimony about people running around her home before she answered the door (discussed above), her testimony contradicts both logic and that of defendant with respect to her ability to see guns with a flashlight shining in her eyes.

15

<u>Defendant</u>

22.  Defendant believes that law enforcement showed up at
his house around 6:00 a.m. when he was still asleep; but he did
not look at a clock or a watch (Tr. at 72).  He heard a loud thud
followed by, "FBI, search warrant!" (Tr. at 72).  After the
entire incident, defendant inspected his front door and observed
that there was a dent in it "from what looked like could have
been a blunt object, a heel of a shoe or something in it."  (Tr.
at 72).  Defendant said one of the agents said the door was not
latched "when he kicked it." (Tr. at 72).  Defendant does not
remember who said that (Tr. at 72).  The door is wooden and is
approximately 20 years old (Tr. at 86).

23.  Defendant's girl friend got up first and defendant
followed her out the bedroom door (Tr. at 73).  When they came
"around the corner," defendant heard someone say, "Put your hands
out in front of you," and a light was shining on defendant and
Ms. Pennington (Tr. at 73).  Defendant could not see any weapons
because of the light shining in his direction (Tr. at 73).  The
agents led defendant and Ms. Pennington toward the agents; and
once the light was taken off them, defendant could see that
weapons were pointed directly at him (Tr. at 73).  He saw at
least one assault rifle (Tr. at 73). The agents were inside the
house when defendant and Ms. Pennington exited their bedroom (Tr.
at 83).

24.    Defendant and Ms. Pennington were taken to the porch
(Tr. at 73).  Defendant asked for his shoes but was denied them
(Tr. at 73).  He asked to put on his jacket, and he was denied
that as well (Tr. at 73-74).  He and Ms. Pennington were told to
sit on the bench on the porch and three agents (two male and one
female) stayed with them (Tr. at 75).  The agents' guns were
holstered at that time (Tr. at 76).  Defendant was not handcuffed
(Tr. at 76).  He was told the agents were there to execute a
search warrant, and he was given a copy of the paperwork (Tr. at
77).  At one point defendant got up and attempted to move around,
but he was told to stay on the bench (Tr. at 76-77).  Defendant
was not told he could leave, and he was frightened (Tr. at 77).
He was not told he was under arrest and he does not know whether
he thought he was under arrest, but he did not believe he was
free to leave (Tr. at 77-78).

25.    After about 15 minutes, two agents came to get
defendant off the porch (Tr. at 77).  They took him into the
dining room (Tr. at 79).  Defendant was told that the agents were
going to interview defendant and Ms. Pennington and that it was
part of the search warrant process (Tr. at 78).  The interview
lasted 20 to 25 minutes (Tr. at 80, 85).  Defendant was asked if
he had heard of certain search terms and defendant said he had
(Tr. at 80).  Defendant does not recall telling the agents he had

used those search terms[3] (Tr. at 81).  Defendant never asked for
a lawyer and never asked to stop the interview or to leave (Tr.
at 81).  He did not think he was free to leave, and he was so
terrified that asking for a lawyer never crossed his mind (Tr. at
81-82).  Defendant did not feel that the interview was "very
voluntary at all;" and he thought there was a strong possibility
that he was going to be arrested afterward (Tr. at 82).

26.  Defendant was never told he could leave and go to work
(Tr. at 84).  He did not, in fact, go to work that day (Tr. at
84-85).  He would normally start work at 10:00 (Tr. at 85).

27.  Defendant agreed that the agents never raised their
voices, never threatened him, and did not arrest him until over a
year later (Tr. at 85). Defendant does not recall whether agents
told him that any statement would be voluntary and that he was
not under arrest (Tr. at 87-88).  He knows he was never told that
he could leave (Tr. at 88).

28.  To the extent defendant's testimony differs from that
of Special Agent Daniels, I find it not credible for the
following reasons:

    a.  Defendant testified that law enforcement arrived
    at 6:00 a.m.; however, he admitted he had not looked at a
    watch or a clock.  He had, however, just sat through the

---

[3]Whether the agents brought up the search terms first or
defendant did is irrelevant to the issue of whether defendant's
statement was voluntary.

testimony of his girl friend, and she testified that law enforcement arrived at 6:00 a.m.  It appears defendant was attempting to corroborate Ms. Pennington's testimony.  I find defendant's testimony about the time the officers arrived to be not credible for the reasons already discussed in the credibility discussion of Ms. Pennington's testimony above.

b.   Defendant testified that an agent kicked in his front door, damaging the door, and that the law enforcement officer indicated that the door had not been locked when he kicked it in.  It is not plausible that a law enforcement officer would kick in a door before checking to see if the door were locked.  Ms. Pennington testified that she and defendant never locked their front door.  Additionally, it is undisputed that the agents had no intention of taking anyone into custody that day, which makes it even more implausible that they felt the need to kick in an unlocked door rather than waiting for the residents to answer.

c.   Defendant testified that he was too terrified to think about requesting a lawyer, yet he admitted that no one threatened him, no one raised his or her voice, he was never handcuffed, he was not arrested, and he was in his own dining room at the time he was questioned.

### III. VOLUNTARINESS OF STATEMENT

Defendant argues that his statement was involuntary; however, he does not provide any basis for his argument.

**Custody**

Miranda v. Arizona, 384 U.S. 436 (1966), requires that a suspect be advised of (among other things) his right to remain silent and to have an attorney with him during questioning.  Law enforcement officers are required to advise a suspect of his Miranda rights only if custodial interrogation takes place.  Id. Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way.  Id. at 429.

In determining whether a suspect is "in custody," courts examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody.  Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  The totality of the circumstances is considered.  United States v. Carter, 884 F.2d 368 (8th Cir. 1989).

The Eighth Circuit has outlined six factors to be considered in determining whether a suspect is "in custody" for Miranda purposes:

> Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest; whether the suspect possessed unrestrained freedom of movement during the interview; whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; whether strong arm tactics or deceptive stratagems were employed during questioning; whether the atmosphere of the questioning was dominated by law enforcement officers; and whether the suspect was placed under arrest at the termination of the questioning.

United States v. Czichray, 378 F.3d 822, 831 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005). The affirmative presence of one or more of the first three factors mitigates the existence of custody at the time of the questioning. United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996). The presence of one or more of the last three factors during questioning will tend to support a finding of custody. Id. A finding of custody does not, however, have to be supported by all six factors. Id.

1. The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Miranda v. Arizona, 384 U.S. at 444. Although failure to advise a suspect that he is free to leave may suggest restraint, the absence of a statement suggesting that a suspect is not free to leave suggests freedom of movement. United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991).

The credible evidence establishes that defendant was informed at the time the officers arrived and prior to his interview that there were no charges pending, no one was under arrest, any statement he made was voluntary, and no one would be arrested and taken away when law enforcement authorities left the residence.

2.    The credible evidence establishes that defendant was moved to the porch of the residence and asked to sit on the bench for the five minutes it took the officers to conduct a security sweep of the residence.  There is no evidence that defendant's freedom of movement was restrained beyond that.

3.    The credible evidence establishes that defendant voluntarily agreed to be interviewed and the interview was conversational rather than question-answer.

4.    Because strong-arm tactics are more generally associated with formal arrest than with an informal encounter with police, the use of such tactics normally supports a finding of custody.  United States v. Griffin, 922 F.2d 1343, 1351 (8th Cir. 1990).  There is no evidence (or even allegation) that law enforcement officers used strong-arm tactics or deceptive stratagems.

5.    An interrogation which occurs in an atmosphere dominated by the police is more likely to be viewed as custodial than one which does not.  Berkemer v. McCarty, 468 U.S. at 438.

The question is whether the entire context of the questioning, including such considerations as place and length of the questioning, whether the police assume control of the place of questioning, and whether they dictate the course of conduct followed by the suspect or other persons present at the scene, demonstrates that the course of the investigation was police dominated. United States v. Griffin, 922 F.2d at 1352; United States v. Longbehn, 850 F.2d 450, 453 (8th Cir. 1988). When a suspect is not subject to any sort of police commands or dictations, custody is usually found lacking. United States v. Jones, 630 F.2d 613, 616 (8th Cir. 1980).

The atmosphere of the questioning was not dominated by law enforcement officers. The questioning took place in defendant's dining room, only two officers were present with him and only one asked questions, the questioning took only 20 to 30 minutes, defendant was not handcuffed, no one raised his voice or acted in a threatening manner.

6.  Finally, it is undisputed that no one was arrested at the conclusion of the questioning.

The "in custody" requirement is not satisfied merely because the person interviewed is the focus of a criminal investigation. Beckwith v. United States, 425 U.S. 341 (1976). Defendant bears the burden of proving that he was in custody at the time the statement was made. United States v. Davis, 792 F.2d 1299, 1308

(5th Cir.), <u>cert</u>. <u>denied</u>, 479 U.S. 964 (1986); <u>United States v.</u>
<u>Charles</u>, 738 F.2d 686,692 (5th Cir. 1984); <u>United States v.</u>
<u>Grissom</u>, 825 F. Supp. 949, 954 (D. Kan. 1993).  I find that
defendant failed to meet this burden.  All of the factors
discussed above support the conclusion that defendant was not in
custody when he made his statement.  Therefore, because defendant
was not in custody, <u>Miranda</u> warnings were not required.

**<u>Voluntariness</u>**

The Fifth Amendment right against self-incrimination
provides the Constitutional basis for the requirement that a
confession be voluntary to be admitted into evidence.  <u>Dickerson</u>
<u>v. United States</u>, 520 U.S. 428 (2000).  In determining whether a
confession is voluntary, a court should examine the circumstances
surrounding the confession, including the conduct of the law
enforcement officials and the capacity of the suspect to resist
pressure to confess.  <u>United States v. Mendoza</u>, 85 F.3d 1347,
1350 (8th Cir. 1996); <u>United States v. Johnson</u>, 47 F.3d 272, 275-
76 (8th Cir. 1995).  Coercive government activity is necessary to
prove that a statement was not voluntary.  <u>Colorado v. Connelly</u>,
479 U.S. 157, 163-64 (1986); <u>United States v. Hatten</u>, 68 F.3d
257, 262 (8th Cir. 1995), <u>cert</u>. <u>denied</u>, 516 U.S. 1150 (1996).
<u>See</u> <u>also</u> <u>United States v. Kilgore</u>, 58 F.3d 350, 353 (8th Cir.
1995) (the appropriate test for determining voluntariness is
whether the confession was extracted by threats, violence or

24

direct or implied promises such that the defendant's will was overborne and his capacity for self-determination critically impaired).

Here there is no evidence of any coercive government activity. There is not even an allegation of coercive government activity. Defendant admitted that no law enforcement officer used threats or raised his voice. Defendant was not scheduled to start work that day until 10:00, so there was not even any pressure of having to be late for work because of the questioning or the execution of the search warrant. Although defendant testified that he did not believe his statement was "very voluntary at all," he did not provide any factual basis for such a statement, and I find none in the record.

## IV. *CONCLUSION*

Based on the above-stated findings of fact and the law as discussed in section III, I conclude that defendant was not in custody at the time he made his statement and that his statement was voluntary. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress his statement.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 1, 2011